Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT
## for the
Middle District of Pennsylvania

_____ Division

Carlton Theodore Landis

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

(1) Lieutenant Wilson, et al.

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

Case No. 1:19-CV-1301
*(to be filled in by the Clerk's Office)*

# COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

**FILED**
~~SCRANTON~~

JUL 2 5 2019

Per _____
DEPUTY CLERK

Page 1 of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.  The Parties to This Complaint

### A.  The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name  *Carlton Theodore Landis*

All other names by which you have been known:  *Carlton Theodore Landers*

ID Number  *24449-056*

Current Institution  *USP Lewisburg*

Address  *P.O. Box 1000*

*Lewisburg*            *PA*            *17837*
City                        State              Zip Code

### B.  The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

Name  *Lieutenant Wilson*

Job or Title *(if known)*  *Lieutenant*

Shield Number  *N/A*

Employer  *Bureau of Prisons*

Address  *2400 Robert F. Miller Drive*

*Lewisburg*            *PA*            *17837*
City                        State              Zip Code

☑ Individual capacity   ☑ Official capacity

Defendant No. 2

Name  *Lieutenant Beachel*

Job or Title *(if known)*  *Lieutenant*

Shield Number  *N/A*

Employer  *Bureau of Prisons*

Address  *2400 Robert F. Miller Drive*

*Lewisburg*            *PA*            *17837*
City                        State              Zip Code

☑ Individual capacity   ☑ Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3

| | |
|---|---|
| Name | Lieutenant Scott |
| Job or Title *(if known)* | Lieutenant |
| Shield Number | N/A |
| Employer | Bureau of Prisons |
| Address | 2400 Robert F. Miller Drive |
| | Lewisburg        PA        17837 |

City        State        Zip Code

☑ Individual capacity   ☑ Official capacity

Defendant No. 4

| | |
|---|---|
| Name | Lieutenant Troutman |
| Job or Title *(if known)* | Lieutenant |
| Shield Number | N/A |
| Employer | Bureau of Prisons |
| Address | 2400 Robert F. Miller Drive |
| | Lewisburg        PA        17837 |

City        State        Zip Code

☑ Individual capacity   ☑ Official capacity   • • • See attached
(The Defendants)

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☑ Federal officials (a *Bivens* claim)

☐ State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

N/A

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Cruel and Unusual Punishment   (See attached)
Basis for Jurisdiction

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

At all relevant times and in all their actions, the defendants were acting under color of federal law and pursuant to their authority as personnel of the Bureau of Prisons.

## III.   Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

- ☐ Pretrial detainee
- ☐ Civilly committed detainee
- ☐ Immigration detainee
- ☐ Convicted and sentenced state prisoner
- ☑ Convicted and sentenced federal prisoner
- ☐ Other *(explain)* _____

## IV.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.   If the events giving rise to your claim arose outside an institution, describe where and when they arose.

N/A

B.   If the events giving rise to your claim arose in an institution, describe where and when they arose.

See Attached (Statement of Claim)

C.      What date and approximate time did the events giving rise to your claim(s) occur?

*See attached (Statement of Claim)*

D.      What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

*See attached (Statement of Claim)*

## V.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

*See attached (Injuries)*

## VI.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

*See attached (Relief)*

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**VII.    Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

USP Lewisburg

B.    Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☐ No

☐ Do not know

C.    Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☐ Yes

☐ No

☑ Do not know

If yes, which claim(s)?

N/A

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.   Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.   If you did file a grievance:

1.   Where did you file the grievance?

USP Lewisburg

2.   What did you claim in your grievance? The defendants were not following their own regulations in regard to the use of force and the application of restraints. The defendants violated my right to be free from cruel and unusual punishment in regard to the use of force and the application of restraints.

3.   What was the result, if any? The grievances were rejected, denied, referred, and/or never answered.

4.   What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  (Describe all efforts to appeal to the highest level of the grievance process.)

See attached (Exhaustion of Admin. Rem. Admin. Pro.)

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

F.   If you did not file a grievance:

1.   If there are any reasons why you did not file a grievance, state them here:

N/A

2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

N/A

G.   Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

N/A

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.   Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☑ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

N/A

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B.   If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s)   _____

Defendant(s)   _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition. _____

7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

_____

C.   Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

☑ Yes

☐ No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.    Parties to the previous lawsuit
      Plaintiff(s)    Carlton Theodore Landis
      Defendant(s)    David J. Ebbert, et al.

2.    Court *(if federal court, name the district; if state court, name the county and State)*

      Middle District Of Pennsylvania

3.    Docket or index number
      1:19-CV-470

4.    Name of Judge assigned to your case
      Chief Judge Conner

5.    Approximate date of filing lawsuit
      March 15, 2019

6.    Is the case still pending?
      ☑ Yes

      ☐ No

      If no, give the approximate date of disposition _____

7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

      N/A

      See attached (Previous Lawsuits)

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    7/24/19

Signature of Plaintiff    *Carlton T. Landis*

Printed Name of Plaintiff    Carlton T. Landis

Prison Identification #    24449-056

Prison Address    P.O. Box 1000

Lewisburg                    PA          17837
City                              State        Zip Code

### B.    For Attorneys

Date of signing:    _____

Signature of Attorney    _____

Printed Name of Attorney    _____

Bar Number    _____

Name of Law Firm    _____

Address    _____

_____
City                              State        Zip Code

Telephone Number    _____

E-mail Address    _____

## I. (B) The Defendants (Cont.)

Lieutenant Ordonez
Lieutenant
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg  PA  17837

✓ Individual Capacity   ✓ Official Capacity

Lieutenant Saylor
Lieutenant
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg  PA  17837

✓ Individual Capacity   ✓ Official Capacity

Lieutenant Leonawicz
Lieutenant
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg  PA  17837

✓ Individual Capacity   ✓ Official Capacity

David J. Ebbert
Warden
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity     ✓ Official Capacity

Associate Warden Colbert
Associate Warden
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity     ✓ Official Capacity

Nurse Mitterling
Nurse
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity     ✓ Official Capacity

2.

Nurse Dees
Nurse
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity   ✓ Official Capacity

Jesse Ayers
Physician Assistant
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity   ✓ Official Capacity

Hugh Herwitz
Director
N/A
Bureau Of Prisons
320 First Street, N.W.
Washington D.C. 20534

✓ Individual Capacity   ✓ Official Capacity

3.

M. Barner
NRP (Nationally Registered Paramedic)
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity   ✓ Official Capacity

Correctional Officer Earp
Correctional Officer
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity   ✓ Official Capacity

Correctional Officer Stroud
Correctional Officer
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity   ✓ Official Capacity

4.

Ian Connors
Administrator National Inmate Appeals
N/A
Bureau Of Prisons
320 First Street, N.W.
Washington, D.C. 20534

✓ Individual Capacity     ✓ Official Capacity

Bureau Of Prisons
N/A                          (APA defendant) ▓▓▓
N/A                          ▓▓▓▓▓ ▓▓▓▓▓▓▓▓
N/A
320 First Street, N.W.
Washington, D.C. 20534

✓ Individual Capacity     ✓ Official Capacity

▓▓▓▓▓ ▓▓ J. Konkle
Captain
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity     ✓ Official Capacity

5.

Steve Brown
Health Service Administrator
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity      ✓ Official Capacity

J. Knigh
Chief Psychologist
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity      ✓ Official Capacity

John Doe
Unit Manager
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity      ✓ Official Capacity

6.

John Doe
Correctional Officers
N/A
Bureau of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity      ✓ Official Capacity

J. Ray Ormond
Regional Director
N/A
Bureau of Prisons
U.S. Customs House - 7th Floor , 2nd and Chestnut St.
Philadelphia PA 19106

✓ Individual Capacity      ✓ Official Capacity

John Doe
NRP's (Nationally Registered Paramedics)
N/A
Bureau Of Prisons
2400 Robert F. Miller Drive
Lewisburg PA 17837

✓ Individual Capacity      ✓ Official Capacity

7.

## II. Basis for Jurisdiction (Cont.)
### (Part C.)

In addition to Bivens, this suit is also being brought under the Administrative Procedure Act in order to compel the Bureau of Prisons to follow its own regulations in regard to 28 CFR 552.20-27. Furthermore, I am seeking, pursuant to the Administrative Procedure Act, that the Court review the Bureau of Prisons' interpretation of 28 CFR 552.21 to determine if it is plainly erroneous, unreasonable, and/or inconsistent with the regulation, as such interpretation is given in Program Statement 5566.06 (Use of force and Application of Restraints) (see PS 5566.06 (9)(b)).

8.

## V. Injuries

A. The back side of my left shoulder experienced sharp pains, soreness, and numbness as a conse- quence of me being in a supine position, with both arms raised above my head, for twenty- four (24) hours on the four-point restraint bed.

B. My right knee experienced sharp pains, soreness, and popping as a consequence being in four- point restraints.

C. Both of my wrists experienced sharp pains, swelling, numbness, blistering, nerve damage, and open wounds as a consequence of malicious restraint placement.

D. On or about the 15th of January, 2018, I turned in a sick-call request to Jennifer Seroski, Physician Assistant. PA Seroski conducted a sick-call en- counter at my cell door. PA Seroski told me that they (USP Lewisburg) dealt with the type of restraint- related injuries that I had all the time. PA Seroski stated that the only cure for my injuries was time. PA Seroski told me to buy pain pills from the store and to give the injuries time to heal. PA Seroski stated that the numbness in my hands

9.

came from nerve damage, which she said would
heal itself, as nerves tend to heal themselve by
a small amount per month. Consequently I did
not receive any treatment from medical in regard
to these injuries. I bought pain medicine from
the commissary and let the injuries heal them
selves

E
F) It took up to six months for the injuries
to heal, but my right knee still pops occas
ionally.

F. Humiliation

G. Emotional distress

H. Physical and Mental Pain and suffering.

K. Injuries

10.

VI. Relief

A. Compensatory damages in the amount of $5000, or whatever the Court deems appropriate.

B. Punitive damages in the amount of $5000, or whatever the Court deems appropriate.

C. Injunctive relief to compel the defendants to enforce Bureau of Prisons regulations in regard to the use of force and Application of Restraints outlined in "28 CFR 552.22 (f, g, h(1,3)) and "24(a(1,2), b, d, e, f)" (See Program Statement 5566.06 for rule as quoted here).

D. An award of plaintiff's costs of suit.

E. That the Court compel the Bureau of Prisons to "follow its own regulations" in regard to the use of force and Application of Restraints outlined in "28 CFR 552.22 (f, g, h(1,3))" and ".24(a(1,2), b, d, e, f)" (See Program Statement 5566.06 for rule as quoted here). This relief pertains to the Court's jurisdiction pursuant to the Administrative Procedure Act.

F. All other relief that is appropriate under the circumstances

11.

g. That the Court rule that the Bureau Of Prisons' interpretation of 28 CFR 552.21 (Calculated Use of Force and/or Application of Restraints) is unreasonable, plainly erroneous, and inconsistent with the regulation: The Bureau Of Prisons, via Program Statement 5566.06 (Use of Force and Application Of Restraints), allows prison officials to put inmates in prolonged restraints for merely threatening a prison official; Consequently, prison officials throughout the Bureau of prisons are claiming that inmates are threatening them in order to create a justifiable reason to put inmates ~~in prolonged~~ in prolonged restraints, which allows these prison officials to exact revenge and/or force inmates' compliance. Even if inmates peacefully submit to the Calculated Use of Force Team and the Use of Force Team gains complete control of the inmates without any resistance and without the inmates displaying any sign of imminent violence, the inmates are still put in prolonged restraints.

VII. Exhaustion of Admin. Rem. Admin. Pro. (Cont.)
Part E(4)

In regards to grievance #'s 929225 and 933172:

I appealed the warden's decisions (929225-F1 and 933172-F1) to the Northeast Regional Office, but I never received a response within thirty (30) days as required by BOP policy. Exercising my due diligence, I appealed the no response to the Central Office, claiming that I believed that the regional office never received my grievances because prison officials at USP Lewisburg tampered with my mail in order to disrupt my grievance process. The Central Office rejected the appeals (929225-A1 and 933172-A1), claiming that I had to first file with the Northeast Regional Office. I refiled to the Northeast Regional Office, which rejected the appeals (929225-R1 and 933172-R1) as untimely and said that I had to obtain a memo from prison staff at USP Lewisburg verifying my reason for untimeliness. When I asked Counselor Griffen for a memo, he stated that he could not provide a memo because he had no way to verify that I sent the letters to the regional office. I refiled my appeals to the Central Office again, explaining to them what Counselor Griffen told me, but the appeals (929225-A2 and 933172-A2) were rejected as untimely. Consequently, I exhausted my administrative Rem.

In regards to grievance #967256, I exhausted my administrative remedies at the institutional level

13.

(967256-F1), the regional level (967256-B1), and the central office (967256-A1).

It should be noted that the majority of the grievances that I mailed out while I was on G-Block (from December of 2017 to March of 2018) never arrived to the Northeast regional office and the central office. During the time that I was on G-Block, I used to hand sealed envelopes containing the grievances to correctional officers who were supposed to put the mail in the mailbox, though I doubt that that was happening. It was not until I moved to J-Block and started giving the letters containing the grievance to the correctional counselor as "legal mail" that the letters began to reach their destination and I received responses.

## VIII. Previous Lawsuits (Cont.)
### Part C.

1. Parties to the previous lawsuit
Plaintiff(s)  Carlton Theodore Landis
Defendant(s)  M. Martin et al

2. Court

Southern District of Mississippi

3. Docket or index number
3:19-cv-00177-DPJ-FkB

4. Name of Judge assigned to your case
F. Keith Ball

5. Approximate date of filing lawsuit
March 11, 2019

6. Is the case still pending?
✓ Yes
    No

7. What was the result of the case?
N/A

15.

# Caption (Cont.)

(2)  Lieutenant Beachel
(3)  Lieutenant Scott
(4)  Lieutenant Troutman
(5)  Lieutenant Ordonez
(6)  Lieutenant Saylor
(7)  Lieutenant Leonawicz
(8)  David J. Ebbert
(9)  Associate Warden Colbert
(10) Nurse Mitterling
(11) Nurse Dee's
(12) Jesse Ayers
(13) Hugh Heriwitz
(14) M. Barner
(15) Correctional Officer Earp
(16) Correctional Officer Stroud
(17) Ian Connors
(18) Bureau of Prisons
(19) J. Konkle
(20) Steve Brown
(21) J. Enigh
(22) John Doe
(23) John Doe
(24) J. Ray Ormond
(25) John Doe

The numerical hypertext in the Statement of Claim
refers to this section.

16.

# Statement of Claim

1. On or about January 3, 2018, at USP Lewisburg (G-Block)

   a. At approximately 11:30 a.m., Correctional Officer (C/O) Hess came to my cell door and said, "I need to pull you out. Someone wants to talk to you." I submitted to handcuffs and was brought out of the cell, where C/O Hess and I stood while C/O Stroud put Andrew Fields in my cell. Inmate (I/m) Fields was dressed in orange paper clothing, indicating that he had just been released from ambulatory restraints. I was placed in the cell after I/m Fields and the cell door was secured, at which point C/O Stroud told me to uncuff. I refused to uncuff, as I wanted to first speak with I/m Fields. I proceeded to tell I/m Fields that I cooperated with authorities before, because I wanted to avoid any future problems (similar to those that occured at USP Yazoo City) that could have arisen by me not telling I/m Fields beforehand. I/m Fields responded by saying that he was a "Crip" and, consequently, could not be in the cell with me. At that point I turned toward the officers (Stroud and Hess) and told them that I could not be in the cell with I/m Fields because I cooperated with authorities before. C/O's Stroud

1.

and Hess ignored me and insisted that I uncuff. C/O Stroud then stated, after I refused, "Turn around and I will pull you out of the cell." I complied, but when I turned around, C/O's Stroud and Hess forcibly pulled my cuffed hands out of the slot and uncuffed me. In response, I refused to allow I/M Fields to uncuff. C/O's Yearn and Evans came to the door, joining C/O's Stroud and Hess, and began taking turns verbally harassing me. C/O Yearn stated, "You're a stupid mutherfucker. We're going to put your restraints on so tight that you're going to cry." C/O Yearn stated that if I thought that he was not telling the truth, to ask I/M Fields. I looked at I/M Fields' wrist's and ankles and noticed that he had open wounds on them. I/M Fields replied, "They messed me up with those restraints." "You don't want that to happen to you, do you?" C/O Yearn asked me. I did not respond. C/O Yearn continued, saying that they (USP Lewisburg officials) heard about me from USP Allenwood officials and planned to make me suffer. Lieutenant (Lt.) Wilson eventually came to the door, asking me what was the problem. I reiterated to Lt. Wilson that I could not be in the cell with I/M Fields because I cooperated with authorities before. Lt. Wilson ignored my reasoning and insisted that I allow

2.

I/m Fields to uncuff. When I continued to refuse, Lt. Wilson walked away. Afterward, C/O Munns fabricated an incident report claiming that I threatened him, which correctional officials used to justify putting and keeping me in ambulatory restraints. At no time during this incident did plaintiff engage in violence or display any signs of imminent violence toward staff or inmates.

b. At approximately 12p.m. a Calculated Use of Force Team approached my cell. I peacefully submitted to the confrontational avoidance procedures initiated by the Calculated Use of Force Team. At no time during this incident did I engage in violence or display any signs of imminent violence toward staff or inmates. I was emotionally and physically in control of myself at all times. In spite of my peaceful interaction with the Calculated Use of Force Team, I was still escorted to the third floor landing area, where I was secured into hard ambulatory restraints (metal handcuffs, waist chain, and leg irons). Afterward, I was escorted to the first floor of G. Block, cell #102, where I remained in restraints.

2. On or about January 3, 2018, at USP Lewisburg (G. Block), from 12p.m. to 2p.m.

3.

a. Within fifteen minutes after I was placed in ambulatory restraints, C/O's began prevaricating, manipulating the "15" minute restraint check form in order to justify keeping me in restraints. In complete contrast to the peaceful demeanor I had just displayed during my interaction with the Calculated Use of Force Team. "All of a sudden," within minutes after I was off-camera, correctional officers began falsely claiming that during their restraint checks I was verbally menacing toward them, saying things like "ya'll mutherfuckers pieces of shit," "ya'll don't know who you're fuckin with," "Bring it on pussy bitches," etc. Such a manner of depicting my alleged use of foul language was erroneous and deceptive. For example, "pussy bitches" was language that I had never used in my entire life; in fact, I had never even heard any African-American use foul language in such a combination. But I had heard declasse whites utilize such language, which suggests that "pussy bitches" was a white person's stab at imitating, rather poorly (no pun intended), what he/she believed I, an African-American would say.

b. Lt. Wilson came to conduct a 2-hour restraint

4.

Check. Lt. Wilson was accompanied by C/O's Earp and Stroud. Lt. Wilson told me that I would remain in restraints until I decided to go back into the cell with I/M Fields. I told Lt. Wilson that I/M Fields told me that because he (I/M Fields) was a "Crip" and I cooperated with authorities before, we could not be in the cell together without violence erupting between us as a consequence of our differences. Lt. Wilson continued to tell me that I/M Fields and I were compatible cell mates, irrespective of what I told her. Lt. Wilson even went on to say that there was no evidence that I had cooperated with authorities before, which, she claimed, meant that plaintiff was prevaricating the threat between I/M Fields and I. During the restraint-check, Lt. Wilson told me to not let the handcuffs slide down my arm because it was swelling my arm; even though I did not notice any swelling. I was never verbally menacing toward Lt. Wilson during this time; unfortunately, after Lt. Wilson exited my cell, she decided to prevaricate, claiming that I was unruly and manipulating the restraints, on the 2-hour Lieutenant Restraint-Check form.

3. On or about January 3, 2018, at USP Lewisburg (G-Block), from 2p.m. to 12 a.m.

5.

a. Lt. Troutman came to do several 2 hour Lieutenant Restraints Checks. I explained to Lt. Troutman, after he asked why I was in restraints, that I/M Fields did not want to be in the cell with me because I cooperated with authorities before. Lt. Troutman told me that I would remain in restraints until I decided to go back in the cell with I/M Fields. I was never verbally menacing toward Lt. Troutman during this time, nor did I engage in violence or display any signs of imminent violence. Unfortunately, Lt. Troutman, after he would exit my cell, decided to prevaricate, claiming that I was verbally menacing toward him during the restraint checks. Lt. Troutman's aim at prevaricating was geared toward justifying keeping me in restraints until I decided to go back in the cell with I/M Fields.

b. During this time, several C/O's (names unknown) (23) came to plaintiff's cell door to conduct 15 minute restraint checks. The C/O's would simply look inside the cell without opening the cell door and and quickly walk away without interacting with plaintiff. I was never verbally menacing toward anyone during this time, nor did I engage in violence or display any signs of imminent violence.

6.

toward staff or inmates; unbeknown to me, these C/O's were prevaricating, maliciously manipulating the 15-minute Restraint Check Form, claiming that I was verbally menacing in some shape or form, in order to justify keeping plaintiff in restraints.

4. On or about January 4, 2018, at USP Lewisburg (G-Block), from 12 a.m. to 8 a.m.

a. Lt. Ordonez came to my cell several times to conduct 2-hour restraint checks. I explained to Lt. Ordonez, after he asked why I was in restraints, that I/M Fields did not want me in the cell with him because I cooperated with authorities before. Lt. Ordonez told me that he could not let me out of the restraints because only the lieutenant who put me in the restraints could let me out of the restraints. I was never verbally menacing toward Lt. Ordonez during this time, nor did I engage in violence or display signs of imminent violence; unfortunately, as soon as Lt. Ordonez exited my cell, he turned from being understanding of plaintiff's situation to prevaricating about me, falsely claiming on the 2-hour Lieutenant Restraint-Check Form that I stated, "Do what you gotta do. I'll own your house bro." and "Your wife like chics, cause you're a pussy." Once again; such vernacular

7.

was far from a true replica of what plaintiff, let alone any African-American I had ever met, would say. During my encounters with Lt. Ordonez, he spoke to me cordially, gave me water, and even closed the window that C/O Stroud had maliciously opened. In spite of that, Lt. Ordonez was surreptitiously more concerned with carrying out the malicious plans of his coworkers who wanted me to remain in restraints, so he manipulated the 2-hour Restraint Check form in order to justify keeping me in restraints.

(23)

b. During this time, several C/O's (names unknown) came to my cell door to conduct 15-minute restraint checks. Most of the time, the C/O's would come to my cell door only to quickly look inside the cell and walk away without interacting with me. Sometimes the C/O's would speak to me asking if I was alright, to which I would say yes. I was never verbally menacing toward anyone during this time, nor did I engage in violence or display any signs of imminent violence toward staff or inmates. Unfortunately, these C/O's were prevaricating, maliciously manipulating the 15 minute restraint-check form in order to justify keeping plaintiff in restraints. These C/O's falsely claimed that I told them: "Check my jacket bitch,"

8.

"fuck you" "fuck off" "fuck Lewisburg" "fuck
anybody C/O's" "Piss off" and "I'll fucking be here
tomorrow too." "Fuck" or some variation thereof,
seemed to conveniently take part in almost every
thing I had to say to these C/O's. I never
said any of these things to them, as there was
no reason for me to be "angry" with them; further
-more, "Piss off" and "fuck off" was not part of
my vernacular, nor had I **ever** heard any
African-American use such a combination of foul
language. These were decease whites superimpo-
sing their own shoddy (no pun intended) verna-
cular on me in order to create the appearance
that I was out of control.

5. On or about January 4, 2018, at USP Lewisburg
(G-Block) from 8 a.m. to 2 p.m.

a. C/O Hess came to my cell door several times
to inquire if I was ready to go back in the
cell with I/m fields, I told C/O Hess no.

b. C/O Hess came to my cell door several times
claiming that he wanted to tighten my waist
chain so that my pants would not fall down.
It was at this point that I realized that C/O
Hess was trying to create a justifiable excuse

9.

for maliciously tightening my restraints to force me to go back in the cell with I/m Fields. After I continued to tell C/O Hess that nothing was wrong with my pants; C/O Hess abandoned that strategy.

C. Lt. Wilson conducted five 2 hour restraint checks

i. During Lt. Wilson's first restraint check, she was accompanied by C/O's EAPP and Stroud. The first thing that C/O Stroud did was go to the window and open it all the way while looking at me with a diabolical smile. It was extremely cold outside. Meanwhile; Lt. Wilson kept insisting that I go back in the cell with I/m Fields. I reiterated to Lt. Wilson that I/m Fields did not want me in the cell because I cooperated with authorities. In response, Lt. Wilson claimed that she already spoke to someone in Special Investigation Services (SIS), who told her that I never cooperated with authorities before; consequently, Lt. Wilson claimed that I and I/m Fields were "compatible". I still refused to go back into the cell with I/m Fields. Lt. Wilson told me that I would remain in restraints until I decided to go back in the cell with I/m Fields. Before exiting my cell, Lt. Wilson told me to not allow the handcuffs to slide down my arms because

10.

it would cause my arms to swell. I explained to Lt. Wilson that the handcuffs only slide down my arms when I lard down but that nothing was wrong with my arms.

ii. During Lt. Wilson's second restraint check, she was accompanied by C/O's Earp and Stroud. I asked Lt. Wilson if she would close the window that c/o Stroud had maliciously opened, as it had become extremely cold in the cell. In response to my request, Lt. Wilson asked, "are you going to go back in the cell with Fields?" I refused to go back in the cell with I/m Fields, so Lt. Wilson ignored my request. C/O Stroud, upon entering the cell placed my bag lunch at the back of the top bunk making it impossible for me to reach the bag while I was in restraints. Lt. Wilson kept telling me to not allow the hand restraints to slide down my arms. I once again told Lt. Wilson that the restraints only slide down my arm (about an inch from the wrist) as a result of me laying down on the bed but that my arms were alright. Strangely, Lt. Wilson kept insisting that I keep the restraints at the wrist, in spite of the logical explanation that I offered her. At one point, I realized that Lt. Wilson was trying to create the illusion that my restraints were not

11.

properly fitted so that she would have an excuse to tighten the restraints later. On their way out of the cell, C/O Earp maliciously stomped on my bare feet with his boots, causing extreme pain and discomfort in my right foot for weeks.

iii. During Lt. Wilson's third restraint check, she was accompanied by C/O's Earp and Stroud and a nurse (mitterling). Upon entering the cell, the nurse checked plaintiff's restraints. After checking the restraints, the nurse turned toward Lt. Wilson, shook her head at Lt. Wilson in an affirmative manner without saying anything, and walked out of the cell, where she stood at the door as Lt. Wilson told me to "stand up." I stood up and Lt. Wilson began tightening my restraints at the wrists while I was being held at both arms by C/O's Earp and Stroud, who both began laughing at me. When I told Lt. Wilson that the restraints were too tight, Lt. Wilson told me that she could tighten the restraints as much as she wanted because the nurse told her that it was justified because my arms were swollen. Lt. Wilson claimed that the tightness would cause the swelling to go down. I told Lt. Wilson that I was losing feeling in both hands, but Lt. Wilson stated that as long as my blood was circulating, she could

12.

tighten the restraints to whatever degree she deemed necessary; the nurse looked at me and shook her head in agreement with Lt. Wilson. Lt. Wilson also maliciously tightened my waist chain, which had nothing to do with the reason Lt. Wilson concocted to explain the imaginary swelling of my arms.

iv. At approximately 12:10 p.m., I asked C/O Condit to loosen my restraints. C/O Condit told me that the restraints would be loosened only if I went back in the cell with I/M Fields. During the verbal exchange with C/O Condit, I banged my forehead against the wall as a gesture of frustration about the maliciously tightened restraints. In response, C/O Condit falsely claimed that I was trying to mutilate myself. Consequently, the Immediate Response Team entered my cell to evacuate me and, afterward, I was issued an incident report for self-mutilation.

v. At 2:00 p.m. Lt. Wilson conducted a restraint check. Lt. Wilson asked if I was ready to go back in the cell with I/M Fields. I declined, telling Lt. Wilson that I could not go in the cell with I/M Fields due to my past cooperation with authorities. Lt. Wilson claimed that she talked to SIS and

13.

SIS told her that I never cooperated with authorities before. I asked to talk with SIS to which Lt. Wilson stated that she would call SIS, but she reiterated that SIS would not do anything because she had already spoken with SIS. Lt. Wilson kept telling me that she needed me to go back in the cell with I/M Fields, but I continued to refuse and was kept in restraints for refusing to live with I/M Fields.

vi. After each of the restraint checks conducted by Lt. Wilson she maliciously manipulated the 2-hour Restraint Check Form by claiming that I was disruptive and upset which Lt. Wilson felt would justify keeping me restraints until I submitted to her desire for me to go back in the cell with I/M Fields. Moreover, Lt. Wilson wanted to create the impression that I was "manipulating" the restraints, so she manipulated the 2-hour Restraint Check Form beforehand, claiming that I was manipulating the restraints, because she knew that she was going to maliciously tighten my restraints later. Lt. Wilson's aim was to use the fabricated claims she lodged on the 2-hour Restraint Check Form to cover her malicious behavior, so that when my wrists ended up damaged, as they were, she could say that

14.

I caused it. Lt. Wilson was so devious and hard-ened that she even incorporated nurse Mitterling to help her fabricate the claim that my restraints had to be "readjusted" because my arms were swollen due to the "manipulating" the restraints.

vii. During the 15-minute restraint-checks, C/O's [23] continued to prevaricate in order to justify keeping me in restraints. The C/O's [23] falsely claimed that I said things like: "Man fuck that bitch Lt.", "I'm hard as a motherfucker," "These chains ain't shit!", "fuck all ya'll," "You's a bunch of bitches," and "fuck off". I never made such statements toward anyone. In fact I have never told anyone in my entire life to "fuck off" or that "I'm hard as a motherfucker." Such verbal expressions were never used among African-Americans of my socioeconomic background; con-sequently, I never verbalized any frustration or anger in such a manner. These C/O's [23] just like Lt. Wilson, also manipulated the 15-minute Restraint-Check Form to create the impression that I was "twisting [my] wrists" and "pulling [my] restraints," which the C/O's [23] seemed to do automatically once I was placed in restraints, as if they were trained to do so and were expecting that my restraints would be tightened at some point in the near future (this would necessitate the prefabricated claims that I was "manipulating" my restraints, just in case the prison officials were accused of wrong-doing in regard to damaging my wrists).

15.

6. On or about January 4, 2018, at USP Lewisburg (G-Block) from 2p.m. to 12 a.m.

a. Lt. Troutman conducted several 2-hour restraint checks. Lt. Troutman refused to loosen the hand restraints and waist chain that Lt. Wilson had maliciously tightened. Plaintiff told Lt. Troutman that my hands were numb due to the restraints being too tight, but Lt. Troutman stated that the restraints would be loosened only if I agreed to go back in the cell with I/M Fields. Lt. Troutman even claimed that he could not take me out of restraints because the shift that put me in restraints had to take me out of restraints. I was never verbally menacing toward Lt. Troutman during these encounters, but in order to justify keeping me in restraints, Lt. Troutman, after exiting my cell, manipulated the 2-hour restraint check form by falsely claiming that my "attitude remains poor," that I

16.

cursed at him, and that I "refused to speak when spoken to."

b. C/O's[23] continued to manipulate the 15-minute Restraint-Check Form, falsely claiming that I said: "I got ya'll done," "Get the fuck away from my door," "fuck yourself," "fuck this place," "This ain't shit," "fuck you," "fuck you pig," and "fuck you faggot." I never expressed such foul language toward anyone during this time. The C/O's were simply prevaricating in order to justify keeping me in restraints. The introduction of the words "faggot" and "pig", coupled with the repetitive use of "fuck," was indicative that other C/O's[23] entered the picture and fabricated statements according to how they spoke, which was slightly different from how the previous C/O's spoke. "Faggot" and "pig" were definately not ~~an~~ ~~part~~ part of my vernacular during this time.

7. On or about January 5, 2018, at USP Lewisburg (G-Block) from 12 a.m. to 8 a.m.

a. Lt. Ordonez conducted several two-hour restraint checks. When Lt. Ordonez first checked the restraints, seeing how tight the restraints were, he stated, "Who did you piss off?" I replied by

17.

settled that I **refused** to go back in cell with
Tim Fields and Lt. Wilson tightened my restraints.
After giving me orders, Lt. Ordonez said that he
would not loosen the restraints. Lt. Ordonez also
claimed that he could not let me out of the re-
straints because he did not put me in the restraints.
Lt. Ordonez, after exiting plaintiff's cell, surrep-
titiously manipulated the 2-hour Restraint-Check
form, claiming that my attitude remains poor,
that I "refused to answer questions," and that
I'll cursed at him. I was never aggressive to-
ward Lt. Ordonez in any shape or form. Plaintiff
Ordonez, I was simply adhering to the request of
his co-workers, who wanted me to remain in
restraints until I agreed to go in the cell with
Tim Fields.

b. C/O's continued to manipulate the 15 minute Re-
straint-Check forms, falsely claiming that I
stated: "I'ma just stay in here." "I'll out last
you." "I'm still here." "This ain't shit." "Fuck these
chains." "Suck a dich." "I ain't coming out of
these chains ever." "Fuck off." "You're a weak ass
bitch." "You can't break me." "These chains are
soft," and "I'ma break records in here." I never
used such language toward anyone during this
time. The C/O's prevaricated to justify keeping

18.

me in restraints, as C/O's felt that by claiming I wanted to be in restraints, the concocted statements would help cover their malicious intent to keep me in restraints in order to try to force me to go back in the cell with I/m Fields.

8. On or about January 5, 2018, at USP Lewisburg (G-Block) from 8 a.m. to 12 p.m.

a. Lt. Beachel conducted a 2-hour restraint check at about 8 a.m. Lt. Beachel kept trying to persuade me to go back in the cell with I/m Fields, telling me that I was mistaken by believing that I cooperated with authorities before. After I explained to Lt. Beachel how I was not mistaken in knowing that I cooperated with authorities before, Lt. Beachel stated, as if he was going to pursuade me to change my stance, "So you're checking-in!?" I said yes, and Lt. Beachel walked toward the door with a visage of disappointment. When Lt. Beachel left the cell, he prevaricated on the 2-hour Restraint Check Form, superimposing his personal views on me by claiming that I stated: "When are you going to figure this out, I get my way every time, that's it." Plaintiff never made such a childish statement; Lt. Beachel made up that statement in his own agitated mind because

19.

it was a reflection of how he felt about me. If I had gotten my own way, there would not have been a valid reason to verbalize it, let alone in such a basic manner. [illegible]

b. Lt. Saylor conducted several 2-hour restraint checks. Lt. Saylor told me, "you're going back in the cell with him," "I don't care if you cooperated," and "you'll go in the cell with whoever we put you with." Plaintiff refused to go back in the cell with Tim Fields. In response, Lt. Saylor said that I would remain in restraints. True to form, when Lt. Saylor exited the cell, he also prevaricated on the 2-hour Restraint-Check form, claiming that I "remained non compliant to staff orders to calm behavior." What Lt. Saylor really meant, like the other prison officials that prevaricated, was that I refused to go back in the cell with Tim Fields, so I would "remain in restraints."

c. At approximately 12 p.m. Lt. Saylor released me from restraints, saying that "Lt. Wilson said to let you out. If it was up to me, you would stay in restraints." Lt. Saylor also stated that if I returned to restraints, I would remain in restraints longer. Once out of restraints, I was put back on the third floor of G-Block, cell #306, which was unoccupied

20.

9. (8) The warden's decision to keep me in restraints after my peaceful interaction with the Calculated Use of Team (Team) was malicious. The Team had gained complete control of me without any resistence. Even if we assumed that I did threaten C/O Munns, keeping me in restraints after the Team gained control of me without my resistance was excessive, because threatening C/O Munns, in and of itself, was not justification to keep me in restraints. Continued placement in restraints was supposed to be used to allow me to calm down, not to punish me for threatening C/O Munns. Since I was already calm during my interaction with the Team, my continued placement in restraints was excessive and malicious. Once the threat was made, I could not take it back; consequently, keeping me in restraints could not have helped prison officials to assess the authenticity of the threat or, as malicious prison officials would say, whether I had gained self-control. Furthermore, the threat that I could have feigned self-control before the Team would have continued to be a threat even while I was in restraints.

10. During the time I was in restraints — from January 3, 2018, to January 5, 2018 — I was placed and kept in the most restrictive form of ambulatory restraints (metal handcuffs, shackles, and waistchain), even though I never exhibited any behavior to warrant it. Prison officials ★ never gave

21.

* All defendants that were not previously described
• including defendants in Atterline, and John Does (?)

me the opportunity, as BOP policy requires, to show that lesser progressive restraints would have sufficed. furthermore, prison officials placed me in hard (metal) restraints instead of soft (vinyl, leather, etc.) restraints, even though BOP policy required that soft restraints be utilized unless they were "ineffective, or a past history of ineffectiveness exist[ed]." There was no evidence that soft restraints were ineffective or ineffectiveness existed in the past in regard to me.

11. During the time I was in restraints — from January 3, 2018, to January 5, 2018 — I did sleep. The C/O's(a3) claim that I stayed awake forty-eight (48) hours straight, cursing at them, threatening them, and/or manipulating my restraints was bogus. Such outlandish claims were made because C/O's(a3) felt that they had to constantly claim that I had not gained self-control or their superiors' malicious plan to keep me in restraints would have been unjustifiable, as sleeping entails calmness.

12. During the time I was in restraints, medical personnel (Dees, Barner, Ayers, and John/Jane Does) manipulated the Health Services Restraint Review Forms in order to cover up the misconduct of lieutenants by falsely claiming that they educated me on the dangers of manipulating restraints, that I manipulated my hand restraints, and that

22.

★ Defendants Casey Barто, <span>Mr. Bonnin, Mr. Garto, John Does (26) and Steve Brown</span>
Case 1:18-cv-01101-JEJ-EB   Document 11   Filed 04/29/19   Page 50 of 74
• all defendants that were USP Lewisburg personnel

my hand restraints were properly fitted after Lt. Wilson maliciously tightened my hand restraints and waist chain. I continuously told them, and they saw, that my restraints were too tight, but they refused to intercede. These medical officials* automatically began to falsely claim that I was manipulating my restraints from the time I was put in the restraints up until I was removed from the restraints. Their continued use of the word "manipulation" suggested that I was somehow acting deviously with the restraints, but the reality was that devious medical personnel* were acting in concert with other prison officials (lieutenants, C/O's, etc.) to create the impression that my prospective restraint-related injuries would be my fault instead of the prison official (Lt. Wilson) who would maliciously tighten my restraints. This would explain why most of the prison officials (C/O's, lieutenants, and medical staff) had taken a liking to using the word "manipulate" in the fabrication of their documents.

13. An After-Action Review was conducted on January 3, 2018, by a review panel (Warden[8], Associate Warden[9], Health Service Administrator[20], and Captain[19]). A 24-hour restraint review was conducted on January 4, 2018, at 11:00 a.m., by a review panel (Warden[8], Associate Warden[9], Captain[19], Chief Psychologist[21], and Health Service Administrator[20]). Both review panels conducted reviews in which the panels deliberately

23.

overlooked BOP policy requirements in regard to the use of force and the application of restraints. Firstly, the panels knew that I was placed in the most restrictive form of ambulatory restraints (metal handcuffs*, shackles, and waist chain), which ignored the idea of "progressive" restraints outlined in BOP policy, as I never engaged in any behavior that would have warranted placing me in the most restrictive form of ambulatory restraints. Secondly, the panels knew that I was placed in hard (metal) restraints, which was contrary to BOP policy because no evidence was provided to the panels that soft restraints were "ineffective," or a past history of ineffectiveness exist[ed]." Consequently, the panels knew that the restraints were being utilized "[i]n a manner that cause[d] unnecessary physical pain or extreme discomfort." The panels had the power to correct the prison officials' deviation from BOP policy; but the panels chose to ignore it. Since the panels did ignore such gaping errors, it begs the question as to what else the panels were willing to ignore. For instance, C/O's[[43]] doing the 15-minute restraint checks claimed that I was awake forty-eight (48) hours straight, cursing at them, threatening them, and/or manipulating my restraints about every fifteen (15) minutes during that time. The 24-hour restraint-review panel had to, at least, suspect that something was amiss (such as me not sleeping) with such outlandish claims. But the 24-hour restraint-review panel

24.

apparently ignored it and incorporated — hook, line, and sinker — the outlandish claims in their report to justify their decision to keep me in restraints.

14. Lieutenants Troutman and Ordonez told me that the lieutenant and/or shift that put me in restraints had to let me out of restraints. True to form, after approximately 48 hours (two 24-hour cycles) I was released from restraints on first shift by Lt. Saylor, who told me that Lt. Wilson told him to let me out of restraints. These lieutenants*believed that I was to be reviewed for removal from re-straints every 24 hours, which would put my fate back in the hands of the shift (1st) and lieutenant (Wilson) that originally put me in re-straints. This meant that prison officials at USP Lewisburg tailored the application of restraints to satisfy their own desire to wield influence over in-mates according to their terms. "!!!

15. On or about January 9, 2018, at USP Lewisburg (G Block)

C/O's brought Maurice Robinson to my cell in an effort to house him with me. Before I allowed I/m Robinson to enter the cell, I told him that I cooperated with authorities before; he said that he appreciated the honesty but he did not want to live in the cell with me, and he and the C/O's walked away.

25.

16. On or about January 10, 2018, at USP Lewisburg (G-Block)

C/O's brought I/M Robinson to my cell again in another effort to house him with me, and I relented, allowing him in the cell. Upon entering the cell, I/M Robinson told me that he was an active member of the Gangster Disciples and that he really was not supposed to be living in the cell with me because he could be punished by his gang. I/M Robinson's comments made me skeptical about living with him.

17. On or about January 11, 2018, at USP Lewisburg (Receiving and Discharge (R/D) Department)

a. While I was in R/D waiting for my property, I told the C/O (name unknown) working in R/D that I needed to talk to the Lt. about my cell assignment, the C/O said that he would contact the Lt. Lt. Beachel and Lt. Wilson showed up in R/D. I explained to them the problem, to which Lt. Wilson said, "Robinson checked-in," meaning that he was in protective custody (PC). I told Lt. Wilson that I still did not feel safe being in the cell with I/M Robinson, and Lt. Beachel said "I'm going to walk out of this room to give you some time to think about it. If you don't go back in the cell with him, I'm going to say you threatened my officers and put you in restraints." They left

26.

and Lt. Beachel returned about five minutes later; he asked me if I changed my mind and I said no. Then Lt. Beachel stated that he was going to give me a "Threatening Shot" and that he was going to make me "beg" him to be taken out of restraints.

b. At approximately 9:30 a.m., a Calculated Use Of Force Team approached my holding cell. I peacefully submitted to the confrontational avoidance procedures iniated by the Calculated Use of Force Team. At no time during this incident did I engage in violence or display any signs of imminent violence toward staff or inmates. I was emotionally and physically in control of myself at all times. In spite of my peaceful interaction with the Calculated Use of Force Team; I was still escorted to the B/D landing area; where I was secured into hard ambulatory restraints (metal handcuffs ★, waist chain, and leg irons). Afterward, I was escorted to the first floor of D-Block, Cell #102, where I remained in re-straints.

c. C/O Finch fabricated an incident report claiming that I threatened him, which Correctional officials used to justify putting and keeping me in ambula-tory restraints.

18. On or about January 12, 2018, at USP Lewisburg (D-Block)

27.

a. While I was still in ambulatory restraints, Lt.'s Wilson, Beachel, and Scott came to do a restraint check. **Lt. Beachel** told me to stand up; after I did, Lt.'s Beachel and Scott tightened my hand restraints until I began to lose feeling in both of my hands, while Lt. Wilson stood there watching. Lt. Beachel reiterated what he said in R/D: "I'm going to make you beg me to be taken out of restraints."

b. During the next 2-hour restraint check, **Lt. Saylor** asked me if I was going to go back in the cell with I/M Robinson; I told him I would if he guaranteed that I would not have a problem with I/M Robinson because of my prior cooperation with authorities, and Lt. Saylor said that I would not. Lt. Beachel was also present during this time; he stated that I would remain in restraints.

c. At the next **2-**hour restraint check, Lt. Beachel stated that I would remain in restraints even though I agreed to go back in the cell with I/M Robinson; Lt. Beachel insisted that I would beg him to be taken out of restraints, that I would not get my way.

d. After Lt. Beachel left, I began kicking on the door in order to get someone to loosen the restraints. The C/O's[33] refused to loosen the restraints. Shortly afterward, Lt. Beachel and Lt. Troutman returned to the cell, and Lt. Beachel rehashed the point he

28.

made in R/D, saying that he was not going to loosen the restraints, that he was going to make me beg him to be taken out of restraints, that he was going to put me in four-point restraints if I beat on the door again, which, he claimed, would please him more than anything.

e. The pain caused by the tightened hand-restraints became unbearable after Lt. Beachel left and I began kicking on the door again, asking the C/O's [23] to loosen the restraints; it was to no avail.

f. Within thirty minutes the Calculated Use of Force Team came to my cell. When asked what the problem was, I explained to them that I was kicking on the door in order to get someone to loosen my hand and waist restraints, as they were maliciously tightened by Lt. Beachel and Lt. Scott. Afterward, I peacefully submitted to the confrontational avoidance procedures initiated by the Calculated Use of Force Team. At no time during this incident did I engage in violence or display any signs of imminent violence toward staff or in-mates. En route to J-Block, where the four-point restraint bed was located, I was in extreme pain due to the pressure that was exerted on my back and hands by the restraints.

g. At approximately 4:00 p.m. I was placed in four-point restraints on J-Block, Cell #327. The four-

29.

point restraints were hard (metal) restraints, not soft (vinyl leather, etc.) restraints as BOP policy requires. Lt. Troutman supervised my placement in four-point restraints.

h. Lieutenant Beachel fabricated an incident report claiming that I threatened him, which correctional officials used to justify putting and keeping me in four-point restraints.

19. On or about January 12, 2018, at USP Lewisburg (J. Block)

An elevated form of torture was implemented once I was put in four-point restraints. I was:

a. Put in four-point hard restraints, even though the particular circumstances did not call for hard restraints pursuant to BOP policy.

b. dressed in a two-piece paper suit that provided **no** protection against:

i. an air vent viciously blowing cold air into the room;

ii. two windows in the cell that the Lt.'s (Beachel, Scott, Saylor, Troutman, Ordonez, and others; I asked all of these lieutenants to close the windows but they refused) maliciously left wide open wit

30.

☆ John Does
○ Defendants Dees, Mitterling, Barner, and John Does

freezing temperatures outside (the coldness in the room caused my whole body to shake uncontrollably in a fit of seeming hypothermia, which led to my muscles tightening in extreme pain).

C. Covered in a thin paper sheet that fell to the floor shortly after I was placed in four-point restraints. During the 2-hour Lieutenant Restraint Checks, I asked several lieutenants (Saylor, Beachel, Ordonez, Troutman, and others☆) to recover the fallen sheet and cover me, but they refused. I even asked the medical staff (Dees and others) to cover me up, but they told me to ask the lieutenants. The lack of covering caused me mental and physical pain due to the extreme coldness in the four-point restraints cell. When I would scream in pain for help, prison officials (lieutenants, medical staff, and C/O's) would laugh and walk away.

d. not fed. Lt.'s Scott, Saylor, Beachel, Troutman, Ordonez, and others☆ ignored my request to eat while I was in four-point restraints. I was maliciously denied three meals. Lt. Scott even taunted me with a bag meal, waving it before me while asking if I was hungry; when I said yes, he put the bag down and walked away.

e. not allowed to use the bathroom. I urinated and defecated on myself multiple times. Lt. Beachel said, when I asked him to use the bathroom,

31.

★ Defendants Ordonez, and John Does
• Defendants Dees, Mitterling, Barner, and John Does
⊙ Defendants Saylor, Beachel, Scott, Ordonez, and John Does

"You can use it right where you are." When I asked Lt. Ordonez to use the bathroom, he said "I don't do the urinal." Lt.'s Scott, Saylor, Troutman, and others★ also refused to allow me to use the bathroom. None of the medical staff• asked me or allowed me to use the bathroom, but they manipulated the Health Services Restraint Review Form by saying that I "refused urinal."

f. Not allowed to rotate positions. None of the lieutenants⊙ or medical staff allowed me to rotate positions, even though I complained to them that my left shoulder was in pain due to it being in the same position for a significant amount of time. The pain in my shoulder lasted for weeks after I was removed from restraints.

g. Kept in four-point restraints for approximately twenty-four (24) hours, even though I was never verbally menacing toward any prison official while I was in four-point restraints. Lt. Troutman (the same Lt. who put me in restraints) released me from four-point restraints on January 13, 201 at approximately 6:00 p.m. (the same shift that put me in restraints). When I was released from four-point restraints and downgraded to ambulatory restraints Lt. Troutman manipulated the 2-hour Restraint Check Form by claiming that I said, as I was exiting the four-point restraint cell, "Get the fuck out of here, Lt.!" I never made such

32.

a statement to Lt. Troutman. Lt. Troutman fabricated the statement so that he would have a justification for keeping me in ambulatory restraints. Why Lt. Troutman decided to downgrade me from four-point restraints to ambulatory restraints could not have had nothing to do with me gaining any type of self-control, if he made his decision based on the 15-minute Restraint Check form, which claimed that I was still unruly. Lt. Troutman downgraded my restraints because he felt that I had had enough, it had nothing to do with self-control. Lt. Troutman put me in Four-Point restraints, so according to USP Lewisburg norms it was Lt. Troutman's baby to dispose of.

20. On or about January 13, 2018, at USP Lewisburg (G-Block) from 6 p.m. to 12 a.m.

a. Once I was released from four-point restraints and downgraded to ambulatory restraints, I was escorted back to G-Block, cell #102, in ambulatory restraints.

b. While I was in ambulatory restraints, Lt. Troutman conducted several restraint checks. Lt. Troutman told me that I would remain in restraints for the rest of the night and be completely released from restraints the following morning during first shift, as he could not let me out of restraints because he did not put me in restraints. Mean-

33.

(23)

while, Lt. Troutman and C/O's continued to mani-
pulate the restraint-check forms in order to justify
keeping me in restraints until the following morning,
claiming that I was cursing at C/O's on one hand
and refusing to speak to Lt. Troutman on the other
hand.

21. On or about January 14, 2018, at USP Lewisburg
(G-Block) from 12 a.m. to 8 a.m.

Lt. Leonawicz conducted several restraint checks
while I was in ambulatory restraints. Lt. Leona-
wicz asked me if I was going back in the cell
with ~~Inm Robinson~~ and I said yes. Lt. Leona-
wicz stated that I would be released from re-
straints during first shift that morning. Lt. Leo-
nawicz also claimed that I had to be released from
restraints by the shift that put me in restraints.
During the times Lt. Leonawicz conducted the 2-
hour restraints checks, he prevaricated on the
restraint-check forms in order to keep me in re-
straints until first shift, claiming that I was "agi-
tated towards staff" and "refusing to acknowledge st-
aff."

At 6 a.m. Lt. Leonawicz began to stop prevaricating
on the 2-hour Lieutenant Restraint Check form,
claiming that I "appear[ed] to be showing a pattern
of non-disruptive behaviors." Lt. Leonawicz appeared
to know that I would be released from restraints

34.

★ keeping me in restraints for 72 hours was malicious, excessive, and, consequently, unconstitutional.

by his corrupt comrades in a few hours.

22. On or about January 14, 2018, at USP Lewisburg (G-Block) from 8 a.m. to 8:30 a.m.

a. Lt. Beachel and Lt. Scott made an expected appearance during the 2-hour Lieutenant restraint check. Lt. Beachel asked me if I was going back in the cell with I/M Robinson and I said yes. Lt. Beachel said that I would be released from restraints when he returned.

b. Lt. Beachel (the same lieutenant who originally put me in restraints) removed me from ambulatory restraints at approximately 8:30 a.m. (the same shift on which I was originally put in restraints), which made seventy-two (72) hours (three 24-hour periods)★ that I was in restraints.

c. Once I was released from restraints, I went back in the cell with I/M Robinson on the third floor of G-Block; cell #306.

23. During the time I was in restraints — from January 11, 2018, to January 14, 2018 — several C/O's (names unknown)[63h] came to my cell door to conduct 15-minute restraints checks. Most of the times, the C/O's would come to my cell door, only to quickly look inside the cell and walk away without interacting with me; sometimes the C/O's would

35.

speak to me, asking me if I was alright. I was never verbally menacing toward anyone during this time, nor did I engage in violence or display any signs of imminent violence toward staff or inmates; unfortunately, these C/O's[23] were prevaricating, maliciously manipulating the 15-minute Restraint-Check Form in order to justify keeping me in restraints. The C/O's[23] falsely claimed that I told them: "go fuck yourself," "the fuck you looking at bitch," "the fuck you," "why the fuck you here," "Get off my door bitch," "I ain't gonna break, fuck these pigs," "fuck you cracker," "fuck you bitch," "fuck you fat ass," "you, the fuck are you," "fuck you white fools, leave me alone you white bitch," "fuck you, you racist cracker," "you and Lewisburg ain't shit faggot," "racist pigs," "fuck off," "I will win bitches," "fuck you C.O.," etc. "Fuck," or some variation thereof, seemed to conveniently take part in almost everything I had to say to these C/O's, according to the C/O's[23] who evidently believed that "fuck" would be their savior. I never said any of these things to them, as there was no reason for me to be "angry" with these C/O's. Even if I had cursed at them, it would not have been how these C/O's depicted the fabricated "fuck" rampage. These fabricated statements were clearly authored by declasé whites trying to imitate declasé Blacks, such as myself. Further-more, the C/O's[23] manipulated the 15-minute Restrain Check Form to create the impression that I was

36.

"manipulating [my] restraints," which the C/O's [(23)] seemed to do automatically once I was placed in restraints, as if they were trained to do so and were expecting that my restraints would be tightened at some point in the near future (this would necessitate the prefabricated claims that I was "manipulating" my restraints, just in case the prison officials were accused of wrongdoing in regard to damaging my wrists).

24. The warden's [(5)] decision to keep me in restraints after my peaceful interaction with the Calculated Use Of Force Team was malicious, as it pertained to the incident on January 11, 2018, in R/D. The use of force Team had gained complete control of me without any resistance, I was not "disruptive." Even if one assumed that I did threaten C/O Finck, keeping me in restraints after the use-of-force Team gained complete control of me without my resistance was excessive, because threatening C/O Finck, in and of itself, was not justification to keep me in restraints. Continued placement in restraints was supposed to be used to allow me to calm down, not to punish me for threatening C/O Finck. Furthermore, if I

and threatened C/O Finch's handwere prison officials supposed to assess my calmness— particularly if I was already displaying self-control in my interaction with staff (use of force team)?? Based on the threat alone? Yes it is (as I later discussed became Adopted)

25. During the time I was in restraints — from January 10, 2018, to February 14, 2018 — I was placed and kept in the most restrictive form of ambulatory and four-point restraints (metal handcuffs, shackles, and waist chain), even though my behavior did not square with the degree of restrictiveness. Prison officials never gave me the opportunity (as BOP policy requires) to show that lesser progressive restraints would have sufficed. Furthermore, prison officials placed me in hard (metal) restraints instead of soft (vinyl, leather, etc.) restraints, even though BOP policy requires that soft restraints be utilized unless they were "ineffective" or a past history of ineffectiveness existed." There was no evidence that soft restraints were ineffective or ineffectiveness existed in the past in regard to me. (as I later discussed this factor I did so

26. An After-Action Review was conducted on January 11, 2018, by a review panel (Warden, [8]

38.

associate warden[4], Health Service Administrator, and captain[14]); A 24-hour restraint review was conducted on January 12, 2018, at 9 a.m., by a review panel (warden[5], Associate warden,[4] Captain[14] Chief Psychologist,[21] and Health Service Administrator[20]). Both review panels conducted reviews in which the panels deliberately over-looked BOP policy requirements in regard to the use of force and the Application of Restraints. Firstly, the panels knew that I was placed in the most restrictive form of ambulatory or four-point restraints (metal handcuffs,* shackles, and waist chain), which ignored the idea of "pro-gressive" restraints outlined in BOP policy, as I never engage in any behavior that would have warranted placing me in the most restrictive form of ambulatory or four-point restraints. Secondly, the panels knew that I was placed in hard (metal) restraints, which was contrary to BOP policy because no evidence was provided to the panels that soft restraints were "ineffec-tive, or a past history of ineffectiveness exist-[ed]." Consequently, the panels knew that the restraints were being utilized "[i]n a manner that cause[d] unnecessary physical pain or ex-treme discomfort." The panels had the power to correct the prison officials' deviation from BOP

39.

policy, but the panels chose to ignore it.

27. Lieutenants Troutman and Leonawicz told me that the lieutenant and/or shift that put me in restraints had to let me out of restraints. True to form, after approximately 72 hours (three 24-hour cycles) I was released from restraints on first shift by Lt. Beachel. These lieutenants believed that I was to be reviewed for removal from restraints every 24 hours, which would put my fate back in the hands of the shift (first) and lieutenant (Beachel) that originally put me in restraints. This means that prison officials at USP Lewisburg tailored the application of restraints to satisfy their own desire to wield influence over inmates according to their terms.

28. During the time I was in restraints from January 11, 2013 to January 14, 2013, Lt. Beachel, Scott, Troutman, Ordaniez, Leonawicz, Saylor, and others manipulated the 2-hour restraint check forms by falsely claiming that I had not gained self-control in order to maliciously maintain me in restraints until I decided to go back in the cell with Jim Robinson and until Lt. Beachel got his revenge.

40.

29. During the time I was in restraints — from January 11, 2018, to January 14, 2018 — medical personnel (Dees, Mitterling, Barner, Ayers, and John Does) manipulated the Health Services Restraint Form in order to cover up the misconduct of lieutenants by falsely claiming that they educated me on the dangers of "manipulating" restraints, that I "manipulated" my hand restraints, and that I "refused urinal" the whole time that I was in four-point restraints. Their continued use of the word "manipulation" suggested that I was somehow acting deviously with the restraints, but the reality was that these devious medical personnel were acting in concert with other prison officials (lieutenants, C/O's, etc.) to create the impression that my prospective and/or actual restraint-related injuries would be my fault. These medical personnel's claim that I "refused urinal" was bogus and a clear indication that they had conspired with the lieutenants (Beachel, Scott, Saylor, Ordonez, etc.) to make me suffer; the psychologists clearly indicated that I was of sound mind while I was in four-point restraints; consequently, allowing myself to defecate and urinate (several times) on myself did not square with reality.

30. I filed numerous grievances (929225, 933172, 967256) to defendants Kunkle, Ebbert, Ormond, and Conners in regard to the malicious use of force

41.

and application of restraints; but the grievances were either not answered, rejected in spite of logical explanations given for untimeliness, or denied. When these defendants finally decided to answer (grievance #967256) to the restraint-as-punishment scheme that they were (and still are) conducting, they denied the grievances and claimed that they found nothing wrong with such institutionized practices.

31. The actions described above (1-30) represent the willfull participation of Bureau of Prisons officials (such as the defendants) in a covert program of torture of inmates. The program operates as follows:

a. An inmate refuses an order, such as refusing a cellmate,

b. The inmate is given a Threatening incident report ("shot") to justify what will come next,

c. The Calculated use of force Team is called in to extract the inmate from his cell,

d. The inmate is extracted from his cell, peacefully,

e. The inmate is placed in hard restraints, which consists of metal handcuffs with black box, metal leg restraints, and metal waist chain (the strictest form of ambulatory restraints, which ignores the idea of

42.

"progressive restraints");

f. The inmate is placed in a "restraint cell" until the inmate has regained "self-control";

g. During the restraint-checks, prison officials will ask the inmate if he is ready to follow the order (for example, accept a cellmate); if the inmate says no, the prison officials will

   i. leave the inmate in restraints longer to force compliance,

   ii. tighten the restraints to force compliance, or

   iii. both;

h. Prison officials (lieutenants, correctional officers, psy-chologists, medical personnel) will falsify documents (15-minute and 2-hour restraint-check forms), saying that while the inmate was in restraints, he continued to be "disruptive and made threatening statements (being that the inmate was already given a (bogus) threatening "shot", it will not seem far-fetched when prison officials say that the inmate continued to make threats while in restraints)";

i. The review panels will use the trumped-up informa-tion on the restraint-check forms to justify keeping the inmate in restraints;

Case 1:19-cv-01301-CCC-CA   Document 1   Filed 07/25/19   Page 71 of 74

31. The inmate will be kept in restraints until the malicious prison officials get what they want.

32. The process described above has little to do with whether the inmate has calmed down. It has more to do with inflicting corporal punishment to enforce discipline.

33. Since I have been incarcerated under the care of the Bureau of Prisons, I have witnessed and experienced -- at USP Lewisburg, FCI Petersburg, USP Atlanta, FCI Bennettsville, FCI Pollock, USP Marion, USP Allenwood, USP Leavenworth, and USP Yazoo City -- prison officials engage in the malicious practices described above (1-32). Furthermore, other inmates who have been at other Bureau of Prisons institutions (USP McCreary, USP Canaan, USP Lee County, USP Florence, USP Victorville, USP Hazelton, etc.) have informed me that the same malicious practices described above (1-32) take place at other Bureau of Prisons institutions.

34. The abuse to which I was subjected was consistent with an institutionalized practice of USP Lewisburg,★ which was known to and ratified by defendants Ebbert, Ormond, Connors, Herwitz, and the Bureau of Prisons.

35. Despite knowledge of these institutionalized practices, the defendants Ebbert, Ormond, Connors, Herwitz, and

44.

the Bureau of Prisons have at no time taken any effective action to prevent USP Lewisburg personnel (and Bureau of Prisons personnel at other institutions) from continuing to engage in the malicious behavior described above (1-33).

36. Defendants Konkle, Ebbert, Ormond, Connors, Herwitz, and the Bureau of Prisons had prior notice of the vicious propensities of the remaining defendants★, USP Lewisburg personnel, and Bureau of Prisons personnel at other institutions, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority.

37. The failure of defendants Konkle, Ebbert, Ormond, Connors, Herwitz, and the Bureau Of Prisons to properly train the remaining defendants★, USP Lewisburg personnel, and Bureau of Prisons personnel at other institutions included the failure to instruct them in the proper and prudent use of force and application of restaints, as outlined 28 CFR 552.20-27.

38. The defendants actions as described above are ripe for review under the Administrative Procedure Act; Consequently, the Bureau of Prisons has been added to this complaint to bear the brunt of the judicial review I am requesting in regard to the APA.

45.

Carlton Theodore Landis #24449-056
USP Lewisburg
P.O. Box 1000
Lewisburg, PA 17837

July 24, 2019

Clerk of the Court
United States District Court
Middle District of Pennsylvania
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501-1148

Re: Court Forms and filing of new Action

Dear Clerk of the Court:

Will you please file the enclosed civil action. Furthermore, will you please send me the following forms so that I can complete the enclosed civil action:

- USM-285 (9 forms)
- AO 398 (1 forms)
- AO 399 (6 forms)


Respectfully Submitted,

Carlton T. Landis



Inmate Name: Carlton Landis
Register Number: 74449-056
United States Penitentiary
P.O. Box 1000
Lewisburg, PA 17837

2 3 JUL 2019

CERTIFIED MAIL

7019 0140 0000 2189 8

RECEIVED
SCRANTON

JUL 2 5 20

PER
DEPUTY

US PENITENTIARY
P.O. BOX 1000
LEWISBURG PA 17837
DATE 2 3 JUL 2019

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another address, please return the enclosure to the above address.

Office of the
United States Dis
Middle District of P
William J. Nealon Feder
235 North W
P.O. B
Scranton